## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

MENG HUANG,

          Plaintiff,

v.

THE OHIO STATE UNIVERSITY
and GIORGIO RIZZONI,

          Defendants.

Case No:

## <u>COMPLAINT AND JURY TRIAL DEMAND</u>

## TABLE OF CONTENTS

I.    Introduction .................................................................................. 1

II.   Jurisdiction and Venue ............................................................. 3

III.  Parties ......................................................................................... 4

IV.  Facts ........................................................................................... 6

    A.  Rizzoni Recruited Ms. Huang in China ............................ 6

    B.  Ms. Huang Arrives in Columbus ....................................... 8

    C.  Rizzoni Threatens Retaliation for Non-Compliance with Touching 10

    D.  Rizzoni's Unwanted Touching of Huang Escalates ......................... 12

    E.  Rizzoni Uses Huang's Relationship with Ford as Leverage ........... 14

    F.  Rizzoni Retaliates with Defamation and Disparagement ................ 15

    G.  Further Escalation in Unwanted Sexual Advances ......................... 20

    H.  Rizzoni Abused His Status as an OSU Professor to Coerce Ms. Huang's Submission, and Then to Retaliate Against Her ............... 25

    I.  OSU's Investigation was Engineered to Protect Rizzoni and Put Ms. Huang on Trial Instead of Rizzoni. While This Occurred, Ms. Huang Experienced Further Retaliation ...................................... 36

    J.  OSU and Rizzoni Caused Severe Emotional Distress and Economic Harm to Ms. Huang ........................................................... 41

    K.  OSU Failed to Follow its Sexual Misconduct Policy ...................... 43

V.   Causes of Action .................................................................... 44

    A.  Title IX – Sexual and Racial Harassment (Against OSU and Rizzoni) .............................................................................. 44

    B.  Title IX – Hostile Environment (Against OSU and Rizzoni) .......... 45

    C.  Title VII – Sexual and Racial Harassment (Against OSU and Rizzoni) .............................................................................. 46

    D.  Title IX – Retaliation (Against OSU and Rizzoni) ......................... 48

    E.  Title VII – Retaliation (Against OSU and Rizzoni) ........................ 49

F.    Sexual and Racial Harassment Under the Elliott-Larsen Civil Rights Act (M.C.L. § 37.2101) (against Rizzoni only) .............................. 51

G.    Retaliation Under the Elliott-Larsen Civil Rights Act (M.C.L. § 37.2101) (against Rizzoni only) ..................................................... 52

H.    Fourteenth Amendment Due Process Under 42 U.S.C. § 1983 (against Rizzoni only, in his personal capacity) ............................ 54

I.    Battery (against Rizzoni only) ......................................... 54

J.    Assault (against Rizzoni only) ......................................... 55

K.    Intentional Infliction of Emotional Distress (against Rizzoni only) 56

L.    Negligent Infliction of Emotional Distress (against Rizzoni only) . 56

M.    Tortious Interference with Prospective Contractual Relations (against Rizzoni only) ..................................................... 57

N.    Defamation (against Rizzoni only) ................................. 58

VI.    Prayer for Relief ................................................................ 60

VII.    Jury Trial Demand .............................................................. 60

Plaintiff, Meng Huang, alleges as follows:

## I.      INTRODUCTION

1.      Ms. Huang is a Ph.D. candidate at the College of Engineering of Defendant Ohio State University ("OSU"). Defendant Giorgio Rizzoni is a tenured professor in the College of Engineering and Director of OSU's Center for Automotive Research ("CAR"). Rizzoni has made it a practice to annually visit China to recruit female Chinese students for the OSU Ph.D. at CAR program.

2.      Rizzoni recruited Ms. Huang in March 2014 to the OSU Ph.D. program at CAR and became her Ph.D. Advisor. Rizzoni attempted to engage Ms. Huang in unwanted sexual conduct that escalated over time during the three years that she worked under him in the program. Over this entire period of time, Ms. Huang resisted Rizzoni's advances.

3.      Rizzoni repeatedly threatened to retaliate against Ms. Huang if she would not comply with his sexual advances. She continued, however, to refuse to submit.

4.      Rizzoni first retaliated against Ms. Huang by defaming Ms. Huang to her contacts at Ford Motor Company, where she interned and intended to work following the completion of her Ph.D., and by revoking her supplemental stipend. She continued to resist his advances.

1

5.     Rizzoni then retaliated against Ms. Huang by sabotaging her Ph.D. candidacy exam, causing her to fail and denying her the chance to re-take the exam.

6.     After reporting Rizzoni's sexual harassment, OSU performed a sham investigation designed to shield Rizzoni and protect the University's financial interests (Rizzoni generates a great deal of funding for OSU).

7.     OSU turned a blind eye to Rizzoni's misconduct and issued a bogus 38-page report that credited all of Rizzoni's contentions and ignored his demonstrable false statements. OSU summarily dismissed Ms. Huang's complaints through unfounded and defamatory attacks on her credibility, without any regard to the effect that would have on her emotional well-being, and without any regard to the truth.

8.     OSU facilitated and condoned Rizzoni's misconduct, and retained Rizzoni.

9.     Rizzoni continues to serve as the Director of CAR and a tenured professor at OSU's College of Engineering, and is able to continue to recruit female Chinese students to the OSU Ph.D. program at CAR.

10.     Rizzoni has engaged and may be continuing to engage in similar unwanted touching with other Chinese female Ph.D. students.

## II.    JURISDICTION AND VENUE

11.    The Court has subject matter jurisdiction over Ms. Huang's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over her common law and Ohio statutory claims under 28 U.S.C. § 1367.

12.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Ms. Huang's claims occurred here.

13.    Venue is proper in this District under 42 U.S.C. § 2000e-5(f)(3) because Defendants committed unlawful employment practices under Title VII against Ms. Huang in this District, and because Defendants' unlawful conduct prevented  Ms. Huang form being hired by Ford Motor Company in this District.

14.    As described below, OSU and Rizzoni involved Ford Motor Company employees in their misconduct and interfered with Ms. Huang's relationship with Ford, in this District.

15.    Ms. Huang spent three years working under Rizzoni on a Ford research contract involving the analysis of battery aging for electric vehicles.

16.    Pursuant to this contract, Ms. Huang worked two summers for Ford in Dearborn, Michigan, traveled on several occasions with Rizzoni to Michigan to meet with the Ford research team, and communicated regularly

3

with the Ford research team in Michigan via phone, email, and bi-weekly conference calls.

17.     Ms. Huang developed a close relationship with Ford's technical experts, who stated their intention to hire Ms. Huang upon her graduation from OSU.

18.     That, however, changed when Rizzoni and OSU made false and negative comments to Ford about Ms. Huang, resulting in her removal from Ford's research project.

19.     Additionally, numerous third-party witnesses reside in this District.

## III.   PARTIES

20.     Plaintiff Meng Huang is a citizen of the People's Republic of China and resident of Columbus, Ohio. She is and was at all times relevant a Ph.D. student at OSU and residing in the United States pursuant to a student visa.

21.     Defendant OSU is a large public research university located in Columbus, Ohio. It is part of The University System of Ohio and therefore governed by the Ohio Department of Higher Education. OSU receives federal funding and financial assistance within the meaning of 20 U.S.C. § 1681(a) and is otherwise subject to Title IX and Title VII.

4

22.    OSU's Strategic Plan focuses on the University's drive to be the best university it can be, its obligations to its constituents, and its obligation to meet the needs of changing times:[1]



What Ohio State does matters. And how we do it matters. When we are at our best, we make a real difference to people. Our size, breadth, geography, history and standard of excellence position us to drive the future of higher education.

Our strategic plan is a living framework that allows for flexibility moving forward. What is not flexible is our aspiration to be the best university we can be. We owe it to our students, our faculty, our staff and to our community. We owe it to ourselves. And, because we are Ohio State, we owe it to the nation.

23.    OSU violated this promise to its student, Meng Huang, and this lawsuit seeks redress for its failure to make good on this promise.

24.    Defendant Giorgio Rizzoni is the Director of CAR, and is a

_____

[1] The Ohio State University, Office of the President, https://president.osu.edu/strategicplan/ (last visited August 31, 2018).

5

tenured professor at OSU who holds the Ford Motor Company endowed Chair in Electromechanical Systems. He has been on OSU's full-time faculty since 1990. He resides in Columbus, Ohio.

## IV.   FACTS

### A.   Rizzoni Recruited Ms. Huang in China

25.    In December of 2013, Ms. Huang had a Master's degree in automotive engineering and good job working for an auto manufacturer in Shanghai, China.  Wishing to pursue a Ph.D. in automotive engineering in the United States, she emailed Rizzoni to inquire about Ph.D. study at CAR in the field of automotive engineering.

26.    Rizzoni responded very quickly and encouraged her to apply, promising financial support. He told her that he would travel to Shanghai in the spring of 2014 to meet her in person.

27.    On March 10, 2014, Ms. Huang was admitted to the Ph.D. program, and was assigned to work under Rizzoni at CAR. Rizzoni stated by email that he "was excited to meet her" and confirmed his travel plans to Shanghai to meet Ms. Huang in person.

28.    On March 29, 2014, Rizzoni met with Ms. Huang in Shanghai for coffee in the lobby of his hotel. He then lured Ms. Huang to his hotel room to make her coffee and *spend some quiet time together,* Rizzoni kept

6

Ms. Huang in his hotel room for approximately four hours, during which he repeatedly held Ms. Huang's hand and shoulder while they talked and he had her perform a math problem.

29.     Following the hotel room encounter, Rizzoni insisted that Ms. Huang join him at dinner with Phoebe You, the Shanghai-based Director of OSU's China Gateway Program. During dinner, Rizzoni grabbed Ms. Huang's hand multiple times. At one point later in the dinner, Rizzoni grabbed her hand on top of the table, which she found to be particularly embarrassing, and gazed at Ms. Huang with a weird smile, and said, *look at her, look at her* in a suggestive tone. Ms. Huang, who was not very familiar with American culture, was confused by Rizzoni's behavior and was uncertain exactly how to interpret it. Ms. Huang felt very awkward and uncomfortable and pulled her hand back as soon as she could.

30.     Rizzoni took steps to groom Ms. Huang for abuse.

31.     On April 4, 2014, Rizzoni emailed Ms. Huang an offer letter for a Graduate Research Associate position. While Ms. Huang would have otherwise jumped at this opportunity, she was confused about Rizzoni's behavior during their Shanghai meeting, and therefore did not accept the position until one month later.

32.     Beginning when she accepted Rizzoni's offer in May of 2014

and continuing until Ms. Huang arrived in Columbus on August 21, 2014, Rizzoni displayed an unusual level of enthusiasm for Ms. Huang's impending arrival, sending Ms. Huang repeated emails asking her to come to Columbus soon, asking when she would arrive, and offering to pick her up at the airport.

### B.     Ms. Huang Arrives in Columbus

33.     Rizzoni held his first stateside meeting with Ms. Huang on Sunday, September 7, 2014, in his office at CAR. He drove Ms. Huang to and from the meeting. Once they entered his office, he grabbed her left hand and held her right shoulder with his left hand, and with an excited smile, said, *Meng, I am going to help you succeed.* Ms. Huang was confused because his touching made her uncomfortable but his words sounded like was offering her is support.

34.     Rizzoni then turned her to face his bookshelf and boasted about his book being translated into multiple languages, all the while embracing her side-to-side with his right arm and caressing her lower back. Ms. Huang was shocked and became extremely anxious about what might happen next. Ms. Huang pulled herself away. Rizzoni then asked Ms. Huang to wait for him while he completed some work, and then drove her home. To Ms. Huang's surprise, no research or study-related topics were mentioned during

8

the meeting, and Ms. Huang was confused about why they met. Ms. Huang was disturbed by this interaction and began to be concerned about Rizzoni's intentions.

35.     Only later did Ms. Huang come to understand that this experience with Rizzoni in his office was a harbinger of things to come. He slowly ratcheted up the level of inappropriate touching, while offering Ms. Huang rewards in exchange for her submission. Ms. Huang, however, was not interested in rewards and only wanted Rizzoni treat her fairly and stop touching her.

36.     Rizzoni required regular private meetings in his office with Ms. Huang during the balance of her career at CAR. At the meetings, he would routinely touch her. These meetings usually occurred on weekends, when there were fewer people in the CAR building and it was highly unlikely that someone might walk in on them in his office.

37.     Rizzoni would offer to drive Ms. Huang to and from the meetings, which he used as an opportunity to grab her hand in the car. Ms. Huang would push away his hand, but he would just grab her hand again. This made Ms. Huang feel powerless.

38.     On January 22, 2015, Rizzoni took Ms. Huang to Dearborn, Michigan to visit Ford Motor Company, Ms. Huang's research sponsor and

the sponsor of Rizzoni's chair at OSU. During the car trip, Rizzoni took a call from his wife before he dropped Ms. Huang at her apartment that evening. She thanked him for the ride, said good night, and exited the car. To Ms. Huang's surprise, Rizzoni quickly exited the vehicle, came around to her side, hugged her, and, without warning, kissed her on the cheek. Before she could react, he then said, *Thank you, Meng, it was a nice trip.*

39.    Ms. Huang was offended and humiliated. It happened so quickly that she had no time to anticipate or react. Ms. Huang felt shameful being subject to Rizzoni's advances minutes after his wife was on the car's speaker-phone. Not knowing what to do, she quickly disengaged herself from his embrace and fled to the safety of her apartment.

40.    On April 28, 2015, Rizzoni took Ms. Huang on another visit to Ford. Ms. Huang was riding in the front passenger seat of Rizzoni's car, where Rizzoni insisted that she sit. At some point after the car had entered Michigan, Rizzoni grabbed her hand and placed it under his right buttock, under the pretext of showing Ms. Huang the car's alleged massage seat feature. Embarrassed, Ms. Huang quickly pulled her hand away.

### C.    Rizzoni Threatens Retaliation for Non-Compliance with Touching

41.    On September 18, 2015, Rizzoni took Ms. Huang to an Italian

restaurant for dinner. While explaining how he came to the United States from Italy, Rizzoni caressed her thigh, which was bare because she was wearing a summer dress. She pushed his hand off of her thigh, and then he put it right back and kept caressing. He then warned her, with his hand still on her thigh: *I pay your stipend, you'd better listen to me; otherwise we will have a problem*. He then drove her home after urging her to drink more wine.

42.     During the ride home, he grabbed her hand without her permission as he nearly always did while driving Ms. Huang in his car. Ms. Huang routinely disengaged her hand, only to have him reach for it again.

43.     His comment about paying her stipend proved to be the first of many threats of retaliation by Rizzoni.

44.     Rizzoni made a practice of rubbing Ms. Huang's thigh as they sat next to each other during their bi-weekly conference calls with the Ford research team. Whenever he would do this, Ms. Huang would push her hand off her thigh and turn her legs away from him. He also made a practice of closing his office door during these conference calls so that no one could observe his behavior.

45.     On November 11, 2015, Rizzoni asked Ms. Huang to travel with him again to visit Ford in Michigan. Because the purpose of the visit

was unrelated to her research and because she felt uncomfortable riding in a car for a long distance with Rizzoni, Ms. Huang politely declined. This promptly resulted in complaints from Rizzoni.

46. On January 17, 2016, Rizzoni demanded that Ms. Huang drop a class that she had signed up for in the Electric and Computer Engineering Department, accused her of being unavailable to him, and called her his *worst student.* He threatened her as follows: *your job is to make me and Ford happy and I am much harder to please than Ford. I am ready to cut your funding anytime if you do not obey.*

47. Ms. Huang, against her will, found herself entrapped. Rizzoni made it clear that to resist would result in the decimation of her career.

### D. Rizzoni's Unwanted Touching of Huang Escalates

48. On Sunday, January 24, 2016, Ms. Huang met with Rizzoni in his office to discuss a journal paper he had asked her to review. When Ms. Huang used a metaphor about ions having to "take a detour" from one electrode to another, Rizzoni grasped her hands and rubbed them, while saying, in a suggestive manner, *yeah, I like that word, detour.*

49. Later in the meeting, he asked her to come over to his desk to look at something on his laptop screen. While she did this, he unexpectedly rolled up to her in his desk chair and facing her, squeezed Ms. Huang's legs

12

with his thighs, which placed Ms. Huang's knees uncomfortably close to Rizzoni's genitals. This lasted for several minutes. Feeling cornered because Rizzoni had pinned her between his desk and his genitals, Ms. Huang was sickened and degraded.

50.    Meanwhile, Rizzoni stared directly into Ms. Huang's eyes with a strange grin on his face, while continuing to talk about Ms. Huang's research. Rizzoni could see her reaction of disgust, yet appeared to enjoy the exercise of power and control he was exerting. Ms. Huang was intimidated from resisting him too overtly due to his severe criticism of her a few days earlier, but tried to get him to release her from his grip. After she continued to try to pull away, he finally released her.

51.    Rizzoni required Ms. Huang to meet with her on Valentine's Day, Sunday, February 14, 2016 under the pretext of asking Ms. Huang to copy data from him. Copying data, however, was unnecessary because the entire data set was accessible on a server. In fact, Rizzoni did not actually mention copying the data during the ensuing meeting. Instead, Rizzoni massaged Ms. Huang's shoulder and back during that meeting without her consent, and appeared to be angry when Ms. Huang recoiled from his touch.

52.    Ms. Huang would sometimes use a computer across campus in Scott Lab instead of her desk at CAR, due to superior computational

13

resources at Scott Lab. Rizzoni repeatedly complained by email that they had not spent enough time together, and about her working from Scott Lab instead of CAR. Rizzoni also complained via email to other staff at CAR that Huang was "never at CAR."

53.     Rizzoni thereby began to portray Ms. Huang in a false light to persons at CAR and made CAR a hostile environment for her.

### E.     Rizzoni Uses Huang's Relationship with Ford as Leverage

54.     During the summer of 2016, Ms. Huang held a visiting scholar position at Ford in Dearborn, Michigan.

55.     While this provided her a temporary respite from Rizzoni's abusive and harassing behavior, Ms. Huang had secured this position in large part through Rizzoni and his relationships with the Ford research team. This was a benefit that many of Rizzoni's students received, and an incentive for students to enroll in the program. It also gave Rizzoni further power over Ms. Huang.

56.     Ms. Huang's supervisors at Ford gave her positive reviews and stated that they would bring her in for an official internship the following summer.

### F.      Rizzoni Retaliates with Defamation and Disparagement

57.     After Ms. Huang returned to Columbus in the end of August 2016, Rizzoni requested another private meeting with her over the Labor Day weekend. Ms. Huang declined, and this angered Rizzoni.

58.     On September 18, 2016, Lori Herman from Ford (who was an OSU alumna and close with Rizzoni), emailed Ms. Huang and urged her to apply for a full-time job with Ford.

59.     While it was not clear whether Herman erroneously believed that Ms. Huang was graduating that year, Rizzoni (who was copied on the email) appeared to think that Ford was attempting to recruit Ms. Huang before she finished her degree.

60.     Rizzoni sent a disparaging and defamatory reply to Herman, with the intention of sabotaging  and interfering with Ms. Huang's relationship with Ford:

**From:** Rizzoni, Giorgio [mailto:rizzoni.1@osu.edu]
**Sent:** Wednesday, September 21, 2016 8:10 AM
**To:** Herman, Lori (J.)
**Subject:** Re: Visa sponsored jobs in Ford - Meng Huang

Lori:
Confidential. Please stop paying attention to Meng.
It is not clear to me what she is doing with her life, but she is the worst PhD student I have ever had.
Not technically, but her attitude is completely wrong.
She has no business applying for jobs. She has made minimal progress in her research (just enough to keep Dyche happy, but way below my standards), and there is no way to predict when she will take the PhD candidacy exam. She is a self-centered and stubborn person who does not know how to listen to advice. She also knows how to be very personable. Don't be fooled.
Have you ever heard me speak this way of a student before? Think about it.
I will send you a message I sent her this morning, so you can understand a little better.
Sorry to have to write such an unpleasant message.
G

61.    Herman, was influenced by Rizzoni's disparaging and defamatory statements, and told Ms. Huang by email that Rizzoni was providing her with opportunities and that she owed Rizzoni a "huge thank you." This email by Herman had been  prompted by the following email from Rizzoni:

**From:** Rizzoni, Giorgio [mailto:rizzoni.1@osu.edu]
**Sent:** Wednesday, September 21, 2016 8:25 AM
**To:** Herman, Lori (J.)
**Subject:** Re: confidential

I have tried for some time. She really thinks thst she knows the right way and my advice is useless.
After two years of dealing with this, I have concluded that she does not even begin to understand what a special opportunity it is to be my PhD student.
The other 11 think I am next to God, and act accordingly. And I treat them like kings and queens. I have never had a student who is so blind to reality, and so hard headed.

62.    Rizzoni also sent Ms. Huang an email that threatened her degree and continued participation in the program, and demanded a meeting on a Sunday. He closed the email, saying, *"Do not reply to this email. The next time we speak in person."*

16

63.     When they met, he again threatened that she would not be able to continue her Ph.D. program if she did not listen to him, which she understood to mean submitting to his inappropriate and unwanted touching. While angrily criticizing Ms. Huang, Rizzoni squeezed Ms. Huang's left shoulder and upper arm, stood right in front of her, and stared into her eyes. When Ms. Huang stepped backward trying to pull herself away from Rizzoni, he stepped forward to follow her and moved his hand to rub the left side of her back.

64.     As a result of this encounter, Ms. Huang became depressed and extremely uncomfortable with Rizzoni's continual harassment. While she was repulsed by his continual harassment and controlling abuse, she did not want to lose the degree into which she had already invested two years and so much effort.

65.     After an interval of extremely painful internal conflict, Ms. Huang chose to lower her head, and swallow her humiliation.

66.     During the summer of 2016, Rizzoni continued to make a practice of touching Ms. Huang inappropriately during their meetings in his office. At one meeting during this time period, Rizzoni lifted the hem of her t-shirt and slipped his hand under it, on Ms. Huang's hip, during a conference call with Ford while Ms. Huang was making a presentation. By

timing this to occur during her presentation, Rizzoni made it difficult for Ms. Huang to resist or protest.

67.   At the end of the meeting, Rizzoni followed her and grabbed her buttocks as she walked through the front office of CAR—while knowing that she was carrying her laptop with both hands and was unable to push him away.  Ms. Huang was repulsed by this conduct and felt nauseous.

68.   Ms. Huang began to feel that she was being treated by Rizzoni as his toy—someone he could play with however and whenever he pleased.

69.   Rizzoni would bother Ms. Huang even when he was traveling outside the United States.  For example, Rizzoni emailed Ms. Huang while he was on a trip to France, saying that he was "*thinking of you in France*." This conduct and similar inappropriate expressions of affection showed that Rizzoni was obsessed with Ms. Huang. This unwanted attention made her greatly uncomfortable.

70.   Ms. Huang, who was distraught by this point, requested and received permission to take time off from her studies to travel back to China during winter break—her first return visit to China during her two and a half years at OSU.

71.   Despite having previously approved Ms. Huang's trip to China, Rizzoni emailed her on December 3, 2016 accusing her of leaving the

United States without his permission. He used this email to once again remind her that he held power over her because he paid her, saying, "*do not forget that I am the one who pays the bills.*"

72.    Before Ms. Huang left for China, Rizzoni requested another weekend meeting. Ms. Huang declined because she was working on a take-home exam that weekend. This infuriated Rizzoni and he threatened to retaliate against her job prospects at Ford: "*I should probably tell Dyche [Anderson, Ms. Huang's research supervisor at Ford] that you are not ready for an internship because you are too far behind in your research.*"

73.    While Ms. Huang was in China, Rizzoni emailed her to say her that she was ready to complete the Ph.D. candidacy examination in the spring of 2017.

74.    Ph.D. advisors typically do not advise a student to take the candidacy examination until the advisor is certain that the student will pass, and therefore the examinations are rarely failed. Here, however, Rizzoni sought either to pressure Ms. Huang to submit to his will or to remove her from the program if she refused.

75.    Ms. Huang, for her part, was concerned that Rizzoni's sudden push for the candidacy exam might be premature, and felt that she need more time to finalize her research model.

19

### G.    Further Escalation in Unwanted Sexual Advances

76.    After Ms. Huang returned to Columbus, she was requested by Rizzoni to attend a private meeting in his office on the afternoon of Sunday, February 5, 2017. At the beginning of the meeting, she gave him a large red papercut of a rooster that she brought back from China. The papercut was to celebrate the Chinese Year of the Rooster, and, in effect, wished Rizzoni a good new year according to Chinese culture.

77.    Rizzoni asked Ms. Huang to hang the papercut in his office window, which she proceeded to do. To do this, she had to lean forward to reach over the credenza that was in front of Rizzoni's window. He used this as an opportunity to again to squeeze and rub her buttocks, not stopping until she quickly finished hanging the papercut and turned around.

78.    The fact that Rizzoni had taken advantage of her kind gesture in this manner exasperated Ms. Huang. Nonetheless, Ms. Huang did her best to try to keep calm and explain her research to Rizzoni—she felt that she was unable to protest due to Rizzoni's earlier threats and intimidation.

79.    At the end of the meeting, Rizzoni followed her to his office door and again rubbed her lower back with his hand. This unwanted touching seemed to put Rizzoni was in a jovial mood, and he said it was a good meeting and he was very happy to see Ms. Huang making progress. He

told her, *you only need to listen to me.* His message to Ms. Huang was clear.

80.     A few days later, Rizzoni had knee surgery. While he was home recuperating, he texted Ms. Huang to tell her that the surgery was successful and that he would find a way to connect with her over the weekend.

81.     On Saturday, February 18, 2017, while Rizzoni was still home recuperating, he texted Ms. Huang, telling her to come to his home the following day, under the pretext that he was home-bound due to his recuperation.

82.     Rizzoni, however, had been at CAR two days earlier on the afternoon of February 16, 2017, and was able to walk around to seek Ms. Huang out at her desk.

83.     Ms. Huang complied and went to Rizzoni's home on Sunday, February 19, 2018.

84.     Upon arriving at Rizzoni's house, Ms. Huang had a sinking realization that Rizzoni had lied when he told her that he could easily pick her up or drop her off going to or from CAR because her apartment was on his way—something that he had done many times. Since Rizzoni actually lived on the other side of town from her, this was plainly not true. He lived only five minutes away from CAR, to the southwest. Ms. Huang, however, lived ten minutes northeast of CAR. Giving Ms. Huang a ride increased

Rizzoni's commute from five minutes to over 25 minutes. Ms. Huang surmised that the true reason for Rizzoni offering rides was not generosity, but rather to get time alone with her in his car.

85. Ms. Huang arrived at Rizzoni's house carrying a bag of fruit—a typical gift in Chinese culture when visiting the home of someone who is sick or recuperating. Initially, they sat in the living room for a while reviewing a research report that Ms. Huang had prepared. Rizzoni's son then came downstairs and then left the house, leaving Rizzoni and Huang alone together.

86. Rizzoni then brought Ms. Huang into his home office, and showed her its contents, including a picture of himself coaching his daughter's soccer team. While he did this, he held his arm tightly around her waist, making her acutely uncomfortable and embarrassed.

87. Ms. Huang pushed his arm away and walked back to the living room. Rizzoni followed her and proceeded to make coffee at a wet bar in his living room. While doing so, he cornered her against the sink and put his hand on her breast. Ms. Huang pulled herself away and scampered back across the room, hoping that Rizzoni would relent in his advances.

88. Rizzoni, however, did not stop. He followed her back to the living room and sat on a footstool across from the couch where Ms. Huang

sat—an arm's length away from her. He leaned forward and adjusted her hair several times, and then sat back to rest for a few seconds. Rizzoni then squeezed her breast. Ms. Huang instinctively threw herself back on the couch to pull away from him and crossed her arms over her chest. Rizzoni stood and leaned over her and squeezed her breast again. While squeezing her breast with one hand, he looked her in her face and laughed. He used his free hand to masturbate through his pants.

89.  While this was happening, Ms. Huang became mortified and tremendously humiliated. She also felt trapped—alone with Rizzoni in his house, and did not know what else Rizzoni would attempt. Ms. Huang summoned her resolve and promptly freed herself from him, exited the house, and got in her car. Feeling completely overwhelmed and demeaned, she locked the car doors and then attempted to call a friend—an attorney who was the girlfriend of another Ph.D. advisee of Rizzoni. When the friend did not pick up after several attempts, Ms. Huang eventually collected herself and drove away.

90.  Later that evening, Rizzoni emailed Ms. Huang to thank her, saying that he enjoyed the fruit that Ms. Huang had given him. He also instructed her to continue with her research because her technical report was excellent. The fact that Rizzoni acted as if nothing had happened and

continued to assign her new tasks made Ms. Huang feel powerless and like she was his slave.

91. A few days later on February 22, 2017, Ms. Huang came to his office for a conference call meeting with Ford. Rizzoni again repeatedly attempted to grab her breast during the meeting, but Ms. Huang pushed him away.

92. Seeing that Ms. Huang was not going to submit to his escalating unwanted sexual demands, Rizzoni retaliated. He sent Ms. Huang an email criticizing her for "arguing" with him during the conference call and requested to again meet with her. There was no actual argument—he was referring to her pushing his hand away.

93. Ms. Huang declined Rizzoni's request for a meeting, and spent the rest of February through mid-March 2017 avoiding private meetings with Rizzoni and repeatedly declining his persistent email and text message requests for weekend meetings.

94. Since, by this point, Ms. Huang was avoiding the CAR building and Rizzoni, his abuse deprived Ms. Huang of the benefits of his advisorship and the resources of CAR.

95. In late-March 2017, Ms. Huang resumed the bi-weekly conference call meetings with Ford. During these meetings, Rizzoni

continued to grab Ms. Huang's hand, rub her back, and embrace her, which intensified Ms. Huang's sense of disgust and humiliation. She pushed him away every time, but he relentlessly kept coming back to touch her.

### H.   Rizzoni Abused His Status as an OSU Professor to Coerce Ms. Huang's Submission, and Then to Retaliate Against Her

96.   Rizzoni used his position, status and authority as an OSU professor to pressure Ms. Huang into submitting to his sexual advances. When that failed, he nakedly abused his OSU position, status and authority to retaliate against her.

97.   At all times pertinent to the events described in this Complaint, OSU acted in a supervisory role to Rizzoni. As an OSU professor, Rizzoni was clothed in the authority and legitimacy of OSU.

98.   Rizzoni used his position of trust and confidence to regularly and systematically assault and harass Ms. Huang, and to threaten her in his capacity as an employee, agent, and representative of OSU.

99.   During the rest of the spring of 2017, Rizzoni delayed Ms. Huang's appointment for her candidacy exam—and avoided any mention of the exam to Ms. Huang, while at the same time making false and defamatory statements about her to other members of the mechanical engineering department that Ms. Huang was refusing to work with him to prepare for the

exam.

100.   Ms. Huang was an intern at Ford during the summer of 2017. Rizzoni also again criticized Ms. Huang for returning to China for a few weeks between the end of the semester and the start of her summer 2017 internship at Ford.

101.   The primary purpose of this trip to China was for medical examinations due to the physical manifestations of Ms. Huang's emotional distress resulting from Rizzoni's abuse.

102.   At the end of Ms. Huang's summer internship, she again received extremely positive reviews from Ford and was told that she would be afforded an opportunity to present her project to Ford's Chief Engineer in the spring of 2018.

103.   The Ford Principal Investigator on her project, Dyche Anderson, also told her that Ford wanted to hire her full-time after she finished her Ph.D.

104.   The internship was refreshing to Ms. Huang, who was able to go eleven weeks without being harassed, assaulted, or otherwise threatened and degraded by Rizzoni. Nonetheless, Ms. Huang also felt tremendous fear and desperation knowing that she would have to return to Columbus to finish her Ph.D. and likely face continuing harassment and threats by

Rizzoni.

105. In August of 2017, Rizzoni terminated Ms. Huang's supplemental stipend. He did not inform her of this at the time. She later found out that Rizzoni terminated the stipend when she received her smaller paycheck.

106. Rizzoni also sent a series of defamatory emails about Ms. Huang to members of the MAE Department, accusing her being a stubborn student who would not comply with his directives.

107. Ms. Huang met with Rizzoni in his office on August 22, 2017, after returning to Columbus. As they sat together at the table in Rizzoni's office, he stood, walked behind her chair, and grabbed her breasts. Ms. Huang tried to push him away using her elbows, but he resisted and continued to hold onto her breasts. He finally released them when she forcibly stood up.

108. Ms. Huang then left Rizzoni's office. She was repulsed and nauseated, and in a state of disgrace and despair. She questioned whether she could continue to endure Rizzoni's escalated abuse and finish her Ph.D., in which she had already wasted so much energy in trying to cope with Rizzoni's conduct.

109. Ms. Huang declined Rizzoni's meeting request for Labor Day

27

weekend, but acceded to his request to meet on September 10, 2017 because she believed that Rizzoni would likely retaliate by sabotaging her degree if she did not attend. Ms. Huang's acceptance of this meeting was the result of a fierce internal struggle, as she was anticipating that she would be sexually assaulted again by Rizzoni.

110.   At the meeting, they discussed Ms. Huang's candidacy exam and decided which professors would sit on her committee. Rizzoni then emailed the professors to invite them to serve on her committee, and they all accepted. Rizzoni again held her waist and rubbed her back, shoulder, and arm. The manner in which Rizzoni conducted this touching—as though it was acceptable and appropriate—was acutely disturbing to Ms. Huang, as it make her feel like he owned her.

111.   On September 17, 2017, Rizzoni told Ms. Huang that her Ph.D. candidacy exam proposal was well-written, and thanked her for "listening" to him.

112.   On October 4, 2017, Rizzoni decided to invite Ms. Huang's Principal Investigator at Ford, Dyche Anderson, to sit on her committee and instructed her to draft petition to allow a person from outside OSU to sit on her committee. He also emailed Anderson a copy of her proposal. Anderson later provided positive feedback to Ms. Huang via email, saying it's "quite

good in general" and his comments were "pretty much all minor".

113.   Rizzoni continued to request private weekend meetings with Ms. Huang. When she avoided this, he responded by emailing her, blind copying other MAE Department staff, complaining that she was not meeting with him and asking, *"are you interested in graduating?"*

114.   This was defamatory because Rizzoni copied the other MAE Department staff without providing the necessary context to understand that Ms. Huang's avoiding private meetings was not due to lack of initiative, but rather to protect herself from further abuse by Rizzoni.

115.   On November 15, 2017, Ms. Huang called into a Ford conference call meeting, instead of attending from Rizzoni's office as she usually did. Ms. Huang gave the reason that the MATLAB software license on her laptop had expired and that CAR's IT Manager had not yet renewed it, so she needed to call in from a computer lab where MATLAB software was available. This was also to avoid the hazards of an in-person meeting with Rizzoni.

116.   Rizzoni—recognizing that Ms. Huang was avoiding him— became enraged and shouted, *"Meng, you are sitting at Scott lab instead of here with me in my office at CAR, has nothing to do with your MATLAB license."* Ms. Huang refuted him, saying, *"How am I supposed to do the job*

*without the software for the codes*?" Rizzoni then became furious about Ms. Huang not meeting with him on weekends. This irritated Ms. Huang, knowing that Rizzoni's real purpose was to create opportunities to harass her and that he was retaliating for her avoidance of him by embarrassing her in front of her Ford contacts. She retorted, "*I don't care about complaints or accusations; I only care about finding solutions and making progress on this project. Why can't we discuss about the project now since everybody is online and ready to help?*" Rizzoni became even more irate and said, "*I cannot talk online; I need to meet in person! If you do not want to finish your PhD, we can quickly terminate it!*"

117.   Besides embarrassing Ms. Huang in front of her supervisors at Ford from whom she was seeking a job following graduation, Rizzoni also retaliated by announcing that he would not allow Anderson to serve on her candidacy exam committee.

118.   Rizzoni also immediately sent Anderson an e-mail alleging that Ms. Huang was lying about the expiration of MATLAB license, and further defaming her:

**From:** Giorgio Rizzoni [mailto:rizzoni.1@osu.edu]
**Sent:** Wednesday, November 15, 2017 4:56 PM
**To:** Anderson, Dyche (R.D.)
**Subject:** Meng

Dyche:

Meng's behavior is inexcusable. There is no reason a student should be treating an advisor as she does. I have brought 35 PhD students and some 90 MS students to completion, and I have never see anything like this.

The decision about what constitutes an acceptable dissertation proposal to submit in advance of a candidacy exam is strictly the advisor's, so I do not understand what she thinks she is accomplishing by being rude and argumentative with me, and by refusing to meet with me.

My desire to have anything to do with her is rapidly diminishing. I have tried very hard to look past rude and immature behavior, but I am not sure I can do it for much longer.

If she does not offer an apology and starts behaving like a respectful and cooperative PhD student, and meeting with me like all other students do, I don't think I can continue being her advisor.

Sorry.

Giorgio

P.S.:

Her comments about Matlab not being available at CAR, by the way, is a flat lie. OSU has an open license

with the Mathworks, and it is literally impossible not to have access to Matlab anywhere on campus.

119.    Shortly afterwards, Anderson indicated in an email to Rizzoni that Ms. Huang may have been uncomfortable meeting Rizzoni privately in his office, and that her behavior demonstrated that she was experiencing emotional trauma:

**Subject:** RE: Meng
**Date:** Thursday, November 16, 2017 at 8:48:23 AM Eastern Standard Time
**From:** Anderson, Dyche (R.D.)
**To:** Giorgio Rizzoni

Giorgio,

I will agree you completely on the inexcusability of her behavior yesterday, and if you elect to drop Meng I would understand – and back you up 100% if Meng speaks to me about it. But I spoke with my wife about the entire situation (in more general terms). She had two [very different] comments:

(1) About the Sunday meetings, she said something that never crossed my mind, and probably never crossed yours. It might not be about not wanting to work on Sunday, but rather to be alone in a man's office with no one else in the building. She said it would have made her uncomfortable. (I do not know whether CAR is full or empty on a weekend, this presumes the building is empty)

(2) My wife teaches math at Schoolcraft College. As such, she sees both very good and very bad students – and has students going through difficult circumstances (as well as lazy students). But she had a comment that some of Meng's behavior (not the outburst yesterday) may have the signs of a student suffering from depression. If that is the case, she needs professional help. You had once mentioned that there is a support system in place, but people are often unwilling to seek the help that is available. I know this from personal experience– I did not seek help (even though it was strongly offered) when a close friend of mine murdered her ex-boyfriend [in church, in front of his 13-year old daughter] back around 1993. I know it took me at least two years to recover, possibly longer.

I hope things work out for the best – whatever the best is.

Dyche

120.   Rizzoni again sought another weekend meeting. Ms. Huang insisted on meeting him on a weekday when more people would be present in the CAR building. At the meeting, which occurred on the morning of Friday, November 17, 2017, Rizzoni decreed as follows: "*Meng, if you are unable or unwilling to meet with me over the weekend, we cannot continue with your Ph.D.*" He also assigned her a written qualifying exam (which is usually not done) in addition to the oral exam. He previously had confirmed in writing that her proposal would suffice as a written exam.

121.   At noon that day, Rizzoni sent an email to the committee,

copying Ms. Huang. She noticed that he had changed one of her committee members without consulting or notifying her. Usually the student and advisor decide together on the composition of the committee. When she confronted him about this via email, he replied, *"That is what happens when you never meet with me and never reply to my emails... things change."* This clearly implied that this "change" was in retaliation for her not meeting with him on Sundays and subjecting herself to further harassment.

122.   Notably, Ms. Huang had met with Rizzoni that morning, and he omitted to mention the change in her committee.

123.   A few days later, on November 21, 2017, Rizzoni informed Ms. Huang that he had added another faculty member to her committee. The faculty members Rizzoni added were selected not for their research areas, but for their closeness to Rizzoni.

124.   Rizzoni then directed Ms. Huang to immediately submit the altered committee to the Graduate School for approval, using manufactured urgency to prevent her from protesting.

125.   On December 6, 2017, Rizzoni was asked by Anderson to schedule the conference call meetings for Ms. Huang's project for the following year. Rizzoni declined to do so, instead saying that Ms. Huang's candidacy exam was two days later, and that he would meet with Anderson

the following week when he visited Ford.

126.   This suggests that Rizzoni had already decided to fail Ms. Huang and remove her from his program, and wanted to discuss this with Anderson in person so no email record would be created.

127.   Ms. Huang's oral examination was held on December 8, 2017.

128.   During other students' oral examinations, Rizzoni is known to ask the student questions designed to showcase the student's achievements to the committee.

129.   This time however, Rizzoni, however, did not support, but sought to embarrass Ms. Huang during the examination—both on his own and through the two professors whom he had unilaterally selected at the eleventh hour. The three of them collaborated to dominate the questioning of Ms. Huang during the exam and make her look incompetent. During the examination, they treated her harshly and with derision.

130.   At the end of the exam, Rizzoni summarily demanded that she leave the room so that the committee could deliberate, shouting, *"Meng, out!,"* preventing one of the professors from asking her final questions.

131.   On December 11, 2017, Rizzoni informed Ms. Huang that the committee failed her and decided not to give her a second chance, stating, "*Meng, you didn't meet with me over the weekend and you take that*

*statistics class against my advice. If you had met with me over the weekend on a weekly basis, you could have passed the exam. Now you cannot continue your PhD study and you will not be funded in spring 2018."*

132.   Janeen Sands, the MAE Department Program Coordinator who was also present, said, "*Dr. Rizzoni doesn't want to work with you anymore. So you can just leave by the end of this semester. Or if you want to switch to the Master's Program, you need to pay your own tuition.*"

133.   Sands then asked Ms. Huang if she had any mental health issues, because the committee had described her as being "dismissive." Rizzoni also deceived Sands, saying, *"I made comments on her proposal, but she didn't change anything!"*

134.   Ms. Huang was devastated, as she had devoted so much time to her degree and her research project, while bearing Rizzoni's humiliations and threats and keeping silent about his harassment and sexual assaults, only to keep her degree and graduate.

135.   To this day, Ms. Huang deeply regrets allowing herself to be subjected to Rizzoni's abuse for so long.

136.   The next day, December 12, 2017, Ms. Huang approached Professor Wei Zhang, who had previously agreed to serve on her committee but whom Rizzoni had summarily removed. When she asked him why he

had not attended her exam, Professor Zhang appeared surprised. He reviewed his emails in Ms. Huang's presence and found that his only correspondence regarding her exam was the initial email from Rizzoni inviting him to sit on the committee, which he had accepted. Professor Zhang was evidently unaware that he had been removed from the committee or that the exam had already occurred.

137.   At this point, Ms. Huang knew what she had to do. That afternoon, Ms. Huang approached Professor Vishwanath Subramaniam, who was chair of the Mechanical and Aerospace Engineering department, and reported Rizzoni's long-term sexual harassment, sexual assault, battery, threats, and manipulation of her candidacy exam.

### I.   OSU's Investigation was Engineered to Protect Rizzoni and Put Ms. Huang on Trial Instead of Rizzoni. While This Occurred, Ms. Huang Experienced Further Retaliation

138.   On the afternoon of December 12, 2017, Ms. Huang filed a complaint with the Human Resources representative for the OSU's MAE Department and with the Department Chair. She also made a report to OSU's Title IX Office on December 13, 2017.

139.   On February 2, 2018, Ms. Huang filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission. More than 180 days have passed since Ms. Huang filed her Charge, and she

36

has requested a Notice of Right to Sue from the EEOC.

140.   She filed these complaints not only to seek redress for Rizzoni's sexual harassment, sexual assault, threats, and abuse of the power vested in him by OSU, but to prevent Rizzoni from victimizing other women in the same way. She was particularly concerned due to Rizzoni's apparent proclivity for recruiting from China young female graduate students.

141.   OSU HR assigned Jonathan Parry to investigate the complaint.

142.   It was clear from the beginning that Parry's primary objective was to protect OSU's interests over securing justice for Ms. Huang. He seemed more concerned with finding out who Ms. Huang had told about her allegations—so he could assess how much damage there was to contain—rather than actually investigating her claims.

143.   When Ms. Huang asked Parry whether she should retain an attorney, Parry responded, *"Well it is your decision, but OSU has a huge legal team to protect the University."*

144.   Despite the pending investigation and OSU's obligation not to engage in and prevent retaliation for use of OSU's complaint processes, Ms. Huang experienced retaliation at CAR.

145.   Her access to the CAR building was suspended. CAR also removed her access to the digital files necessary to complete her research—

the project that she had been working on for nearly three years. Despite Ms. Huang's complaints about this, OSU and the Dean of the College of Engineering continued to deny Ms. Huang access to her research.

146. While meeting with Mariyn Weimer, CAR's Senior Associate Director (and interim Director of CAR while Rizzoni was suspended), to seek access to her research, Ms. Huang was treated as the perpetrator rather than the victim. Weimer's primary concern seemed to be protecting Rizzoni's proprietary rights to Ms. Huang's research, and Weimer even went as far as to make the bizarre claim that other students "felt unsafe" with Ms. Huang working in the building.

147. Weimer's conduct made Ms. Huang feel victimized all over again, because it was clear that OSU was favoring Rizzoni in the investigative process.

148. After Ms. Huang told the College of Engineering that OSU's Provost needed to be involved, CAR eventually decided to allow Ms. Huang access to her research. CAR continued, however, to make excuses to delay her access for several more weeks.

149. As a result of Ms. Huang's protest, she was allowed to retake the candidacy exam, which she passed on March 23, 2018. In doing so, she presented the same research proposal that she had presented previously. The

only difference was the presence of her new advisor and a new committee. A faculty representative from the Graduate School was also present to witness the exam.

150.   While Ms. Huang was eventually given a new appointment and funding through the MAE department and given access to her research so that she could complete her dissertation, she was no longer working under Ford's research contract. Instead, on information and belief, another student was assigned by Rizzoni to complete the project for Ford and present to Ford's research team—an invaluable opportunity for a graduate student.

151.   Meanwhile, Ms. Huang's dissertation was reduced from an important project intended to be incorporated into future Ford vehicles to something that would languish in a dusty file upon her graduation.

152.   On March 28, 2018, OSU issued a 38-page report of Parry's investigation, which claimed to find "insufficient evidence" to support Ms. Huang's claim, completely exonerated Rizzoni and branded Ms. Huang as not credible and having made a false report.

153.   The report indicated that Parry had interviewed 39 "witnesses"—most of whom had no first-hand knowledge of any relevant facts, as nearly all of the relevant events occurred when Ms. Huang and Rizzoni were alone together in private behind closed doors.

154.   Parry accepted Rizzoni's denials at face value and sought out witness statements supporting Rizzoni's assertions and impugning Ms. Huang's character.

155.   Since Parry spoke with a large number of witnesses who had little if any relationship with her and long-standing beneficial relationships with Rizzoni, they provided statements that he used to impugn Ms. Huang while favoring Rizzoni.

156.   Parry's investigation was designed to vindicate Rizzoni—the professor with an endowed chair, a CAR directorship and corporate relationships in the automotive industry that are lucrative  to OSU—at the expense of Ms. Huang's emotional well-being and academic career.

157.  OSU attempted to minimize its exposure to Ms. Huang's meritorious claim by belatedly rectifying the wrongful first exam while at the same time supporting Rizzoni. This was done with deliberate disregard for the truth, Ms. Huang's emotional well-being, and the possibility that Rizzoni will abuse other OSU female students in the future.

158.   Rizzoni received no meaningful sanction for his sexual assault and abusive conduct directed at a young female student alone in this Country, without family support and in an unfamiliar culture, and particularly vulnerable to the predatory and abusive conduct of her much

older ostensible mentor, who holds power over her personal and professional well-being.

159.   Parry ended his communication with Ms. Huang by admonishing her not to retaliate or talk to the witnesses about the investigation—underscoring OSU's perverse position that Rizzoni somehow was *Ms. Huang's* victim.

### J.   OSU and Rizzoni Caused Severe Emotional Distress and Economic Harm to Ms. Huang

160.   Because of Rizzoni's defamatory statements to Ford about Ms. Huang and the fact that Parry unnecessarily interviewed a large number of Ford employees in his investigation, Ford withdrew from its previously expressed interest in hiring Ms. Huang.

161.   Ms. Huang's career has been further hampered by the loss of the influential and well-connected Rizzoni as her advisor and mentor in her field who knew her well as a student and PhD candidate. Rizzoni's network of contacts in the automotive industry that he uses to help his students find internships and jobs was one of the reasons Ms. Huang accepted OSU's offer to become part of the Ph.D. program at CAR.

162.   Additionally, Ms. Huang is now afraid to seek employment in the U.S. automotive industry because she fears that Rizzoni will utilize his

large network of connections in the industry to further retaliate against her.

163.   Like many sexual assault and harassment victims, Ms. Huang experienced severe emotional distress from Rizzoni's conduct, which was deeply exacerbated by the fact that she was not believed by the University.

164.   After Ms. Huang failed the pretextual candidacy exam, she was deeply affected, and was unable to eat or sleep, and experienced vomiting and shivering.

165.   Ms. Huang has experienced and continues to experience pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, and post-traumatic stress disorder resulting in physically manifested injuries, including anxiety, depression, sleep disorders, nightmares, and psychological injuries. She has further experienced an immune system disorder which caused a skin ulcer, irregular menstruation, as well as persistent abdominal pain and breast pain.

166.   Ms. Huang was prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

### K.      OSU Failed to Follow its Sexual Misconduct Policy

167.    Despite being informed of Rizzoni's sexual assault, abuse, and harassment of Ms. Huang, OSU failed to take appropriate action (or any meaningful action whatsoever) to address or prevent Rizzoni from continuing his misconduct.

OSU's Sexual Misconduct Policy (No. 1.15) states:

> Members of the university community have the right to be free from all forms of sexual misconduct which impede the realization of the university's mission of distinction in education, scholarship, and service. All members of the university community are expected to conduct themselves in a manner that maintains an environment free from sexual misconduct.

> Sexual misconduct violates the dignity of individuals and will not be tolerated. The university community seeks to eliminate sexual misconduct through education and by encouraging everyone to report concerns or complaints, including third parties when the accused is a member of the university community. The university is committed to stopping sexual misconduct, preventing its recurrence, eliminating any hostile environment, and remedying its discriminatory effects. This policy defines expectations for the university community and establishes mechanisms for determining when those expectations have been violated.

168.    OSU and Rizzoni failed to follow this Policy. Ms. Huang was not provided an environment free from sexual misconduct. Rizzoni engaged

in acts of sexual misconduct towards Ms. Huang and overt acts of retaliation for her resistance to his misconduct.

169.   OSU further allowed Rizzoni to create a hostile environment for Ms. Huang at CAR.

170.   OSU also failed entirely to fairly investigate Rizzoni's sexual misconduct, to prevent its recurrence, to remedy its discriminatory effects and to refrain from retaliation.

171.   OSU and Rizzoni violated Ms. Huang's dignity, OSU's own "zero-tolerance" policy and the law.

## V.   CAUSES OF ACTION

Through the following causes of action, Ms. Huang brings this action to secure redress for OSU and Rizzoni's treatment of her, as well as to prevent OSU and Rizzoni from similarly abusing other women and to ensure that OSU conducts fair investigations, and refrains from retaliation, in the future.

### A.   Title IX – Sexual and Racial Harassment (Against OSU and Rizzoni)

172.   Ms. Huang restates and realleges all prior paragraphs of the Complaint as if set out here in full.

173.   At all relevant times, OSU received federal funding and

assistance.

174. Ms. Huang was subjected to sexual harassment and sexual assault by Rizzoni, facilitated by his OSU position, status and authority, that was so severe, pervasive, and objectively offensive that it deprived her of access to educational opportunities and benefits at OSU and through OSU's relationship to Ford Motor Company.

175. OSU had actual knowledge of sexual harassment sustained by Ms. Huang.

176. The harassment of Ms. Huang occurred in a context that was subject to OSU's control and in which OSU was obligated to take, and could have taken, remedial action.

177. OSU's response to the harassment sustained by Ms. Huang was deliberately indifferent and unreasonable in light of the known circumstances.

178. This sexual harassment and assault occurred because of Ms. Huang's sex (female) and race, color, and national origin (Chinese).

### B.     Title IX – Hostile Environment (Against OSU and Rizzoni)

179. Ms. Huang restates and realleges all prior paragraphs of the Complaint as if set out here in full.

180. Ms. Huang was subjected to physical sexual harassment that

was so severe, pervasive, and objectively offensive that she was denied access to educational opportunities and benefits at OSU and through OSU's relationship with Ford Motor Company.

181.   For Ms. Huang, OSU's CAR program and building became a sexually hostile environment where her harasser was often only steps away. Every time she entered the CAR building, Ms. Huang had a fear that Rizzoni would sexually harass her physically. This made her feel physically ill, and caused her to avoid the CAR building and restrict her work in the CAR program, to the detriment of her career.

182.   This sexual harassment and assault occurred because of Ms. Huang's sex (female) and race, color, and national origin (Chinese).

183.   OSU was deliberately indifferent to Rizzoni's known sexual harassment and the sexually hostile educational environment she suffered.

184.   As a result of OSU's deliberate indifference and protection of Rizzoni, Ms. Huang has been forced to stay away from CAR and has lost educational opportunities, benefits, and career opportunities.

### C.    Title VII – Sexual and Racial Harassment (Against OSU and Rizzoni)

185.   Ms. Huang restates and realleges all prior paragraphs of the Complaint as if set out here in full.

186.   Ms. Huang is an employee of OSU as defined by Title VII.

187.   Ms. Huang suffered repeated sexual harassment and sexual assault at the hands of Rizzoni, her supervisor, in the course of her employment.

188.   This harassment was severe and pervasive, and created a hostile work environment for Ms. Huang.

189.   Further, Rizzoni made threats of retaliation (and did retaliate) when Ms. Huang resisted his advances. This created *quid pro quo* harassment to which Ms. Huang was required to submit in order to complete her Ph.D. and secure employment with Ford.

190.   This sexual harassment and assault occurred because of Ms. Huang's sex (female) and race, color, and national origin (Chinese).

191.   This sexual harassment and assault was, at all times, unwelcome.

192.   Ms. Huang filed a charge of discrimination against OSU with the EEOC, alleging sexual harassment and retaliation, on or about February 2, 2018. Since Ms. Huang's EEOC Charge has been pending more than 180 days, she has requested that the EEOC issue a notice of right to sue.

193.   As a result of this sexual harassment and assault, Ms. Huang suffered tangible employment actions, including but not limited to reduced

47

access to the resources of CAR, a delay in earning her Ph.D., and interference in her ability to secure employment with Ford.

### D.   Title IX – Retaliation (Against OSU and Rizzoni)

194.   Ms. Huang restates and realleges all prior paragraphs of the Complaint as if set out here in full.

195.   Ms. Huang engaged in protected activity by resisting Rizzoni's attempts to engineer situations where he would be able to forcibly touch her, by repeatedly pulling away from inappropriate touching by Rizzoni, by reporting sexual harassment and assault on or about December 12, 2017, and by filing a charge of discrimination with the EEOC on or about February 2, 2018.

196.   Rizzoni and OSU took the following adverse actions against Ms. Huang in retaliation for her protected activities:

   a.   Making harassing, threatening, and demeaning comments to Ms. Huang;

   b.   Manipulating Ms. Huang's Ph.D. candidacy committee to fail her exam and denying another opportunity to take her candidacy exam;

   c.   Interfering in Ms. Huang's prospective employment with Ford and defaming Ms. Huang to her contacts there;

d.  Depriving Ms. Huang of the opportunity to complete her dissertation under Ford's auspices;

e.  Revoking Ms. Huang's 10% supplemental stipend delaying Ms. Huang's appointment for fall 2017;

f.  Communicating private information and making defamatory statements, about Ms. Huang under the guise of an investigation and then producing a biased, unfair and defamatory investigation report designed to clear Rizzoni and attack Ms. Huang; and

g.  Depriving her of a harassment-free workplace and of the benefits and privileges of participation in the CAR program.

197.  Ms. Huang suffered damages as a result of this retaliation.

### E.   Title VII – Retaliation (Against OSU and Rizzoni)

198.  Ms. Huang restates and realleges all prior paragraphs of the Complaint as if set out here in full.

199.  Ms. Huang engaged in protected activity by resisting Rizzoni's attempts to engineer situations where he would be able to forcibly touch her, by repeatedly pulling away from inappropriate touching by Rizzoni, by reporting sexual harassment and assault on or about December 12, 2017, and by filing a charge of discrimination with the EEOC on or about February 2,

2018.

200.   Rizzoni and OSU took the following adverse actions against Ms. Huang in retaliation for her protected activities:

a.   Making harassing, threatening, and demeaning comments to Ms. Huang;

b.   Manipulating Ms. Huang's Ph.D. candidacy committee to fail her exam and denying another opportunity to take her candidacy exam;

c.   Interfering in Ms. Huang's prospective employment with Ford and defaming Ms. Huang to her contacts there;

d.   Depriving Ms. Huang of the opportunity to complete her dissertation under Ford's auspices;

e.   Revoking Ms. Huang's 10% supplemental stipend delaying Ms. Huang's appointment for fall 2017;

f.   Communicating private information and making defamatory statements, about Ms. Huang under the guise of an investigation and then producing a biased, unfair and defamatory investigation report designed to clear Rizzoni and attack Ms. Huang; and

    g.  Depriving   her of a harassment-free workplace and of the benefits and privileges of participation in the CAR program.

201.  Ms. Huang suffered damages as a result of this retaliation.

**F.    Sexual and Racial Harassment Under the Elliott-Larsen Civil Rights Act (M.C.L. § 37.2101) (against Rizzoni only)**

202.  Ms. Huang restates and realleges all prior paragraphs of the Complaint as if set out here in full.

203.  Ms. Huang is an employee of OSU.

204.  Ms. Huang suffered repeated sexual harassment at the hands of Rizzoni, her supervisor, in the course of her employment, and within the State of Michigan.

205.  This harassment was severe and pervasive, and created a hostile work environment for Ms. Huang.

206.  Further, Rizzoni made threats of retaliation (and did retaliate) when Ms. Huang resisted his advances. This created *quid pro quo* harassment to which  Ms. Huang was required  submit in order to complete her Ph.D. and secure employment with Ford.

207.  This sexual harassment and assault occurred because of Ms. Huang's sex (female) and race, color, and national origin (Chinese).

208.  This sexual harassment and assault was, at all times,

unwelcome.

209.   As a result of this sexual harassment and assault, Ms. Huang suffered tangible employment actions, including but not limited to reduced access to the resources of CAR, a delay in earning her Ph.D., and interference in her ability to secure employment with Ford.

### G.   Retaliation Under the Elliott-Larsen Civil Rights Act (M.C.L. § 37.2101) (against Rizzoni only)

210.   Ms. Huang restates and realleges all prior paragraphs of the Complaint as if set out here in full.

211.   Ms. Huang engaged in protected activity by resisting Rizzoni's attempts to engineer situations where he would be able to forcibly touch her, by repeatedly pulling away from inappropriate touching by Rizzoni, by reporting sexual harassment and assault on or about December 12, 2017, and by filing a charge of discrimination with the EEOC on or about February 2, 2018.

212.   Rizzoni and OSU took the following adverse actions against Ms. Huang in retaliation for her protected activities:

   a. Making harassing, threatening, and demeaning comments to Ms. Huang;

b. Manipulating Ms. Huang's Ph.D. candidacy committee to fail her exam and denying another opportunity to take her candidacy exam;

c. Interfering in Ms. Huang's prospective employment with Ford (in the state of Michigan) and defaming Ms. Huang to her contacts there;

d. Depriving Ms. Huang of the opportunity to complete her dissertation under Ford's auspices, which would have involved substantial travel to Michigan and contacts with Ford representatives in Michigan;

e. Revoking Ms. Huang's 10% supplemental stipend delaying Ms. Huang's appointment for fall of 2017;

f. Communicating private information and making defamatory statements (including in the state of Michigan), about Ms. Huang under the guise of an investigation and then producing a biased, unfair and defamatory investigation report designed to clear Rizzoni and attack Ms. Huang's; and

g. Depriving of her of a harassment-free workplace and of the benefits and privileges of participation in the CAR program.

213. Ms. Huang suffered damages as a result of this retaliation.

**H.     Fourteenth Amendment Due Process Under 42 U.S.C. § 1983 (against Rizzoni only, in his personal capacity)**

214.   Ms. Huang restates and realleges all prior paragraphs of the Complaint as if set out here in full.

215.   Rizzoni is clothed with state authority by Ohio R.C. § 3335, which provides for the creation and operation of OSU as a state entity and empowers OSU's Board of Trustees to appoint professors and administrators such as Rizzoni.

216.    As described above, Rizzoni used his OSU position, status and authority to subject Ms. Huang to sexual harassment, sexual assault, and retaliation. He further attempted to use this position, status and authority to improperly coerce her into compliance.

217.   Rizzoni's conduct deprived Ms. Huang of her liberty and property without due process in violation of law under the Fourteenth Amendment to the United States Constitution and contrary to her rights protected by 42 U.S.C. § 1983.

**I.     Battery (against Rizzoni only)**

218.   Ms. Huang restates and realleges all prior paragraphs of the Complaint as if set out here in full.

219.   Rizzoni intended to, and did in-fact, engage in repeated non-

54

consensual, harmful, offensive, sexual and physical contact with Ms. Huang, as summarized in this complaint.

220.   This intentional conduct caused Ms. Huang emotional and pecuniary harm.

221.   This conduct was willful, wanton, malicious, and oppressive, and was undertaken by Rizzoni with the intent to harm Ms. Huang, and this conduct justifies the award of exemplary and punitive damages.

### J.   Assault (against Rizzoni only)

222.   Ms. Huang restates and realleges all prior paragraphs of the Complaint as if set out here in full.

223.   Rizzoni intended to, and did in-fact, assault Ms. Huang and cause her to operate in a nearly-constant state of apprehension that he was going to forcibly engage in nonconsensual sexual contact with her. Such contact would have been harmful and offensive.

224.   This intentional conduct caused Ms. Huang emotional and pecuniary harm.

225.   This conduct was willful, wanton, malicious and oppressive, and was undertaken by Rizzoni with the intent to harm Ms. Huang, and this conduct supports an award of exemplary and punitive damages.

### K.      Intentional Infliction of Emotional Distress (against Rizzoni only)

226.   Ms. Huang restates and realleges all prior paragraphs of the Complaint as if set out here in full.

227.   As summarized in this Complaint, Rizzoni acted outrageously and intentionally to cause emotional distress in Ms. Huang with the wrongful purpose of inducing compliance with his desire for power over her and his desires to sexually touch her and to satisfy his desires.

228.   This distress was intended to be, and actually was, so severe as to affect Ms. Huang's mental and physical health.

229.   This intentional conduct caused Ms. Huang emotional and pecuniary harm.

230.   This conduct was were willful, wanton, malicious and oppressive, were undertaken by Rizzoni with the intent to harm Ms. Huang, and this conduct supports an award of exemplary and punitive damages.

### L.      Negligent Infliction of Emotional Distress (against Rizzoni only)

231.   Ms. Huang restates and realleges all prior paragraphs of the Complaint as if set out here in full.

232.   Rizzoni acted negligently to cause emotional distress to Ms. Huang.

233.   As summarized in this complaint, Rizzoni violated OSU's sexual harassment policy and his duties with respect to Ms. Huang and failed to use reasonable care to prevent emotional distress to her.

234.   This distress was so severe as to affect Ms. Huang's mental and physical health.

235.   Rizzoni's negligent conduct caused Ms. Huang emotional and pecuniary harm.

## M.   Tortious Interference with Prospective Contractual Relations (against Rizzoni only)

236.   Ms. Huang restates and realleges all prior paragraphs of the Complaint as if set out here in full.

237.   As summarized in this Complaint, Ms. Huang had a prospective contractual relationship with Ford Motor Company and a reasonable expectation of permanent employment with Ford Motor Company in Michigan. She received excellent feedback during her Ford internships and was assured by Ford that Ford would like to provide her a job offer when she completed her Ph.D.

238.   Rizzoni proceeded to defame Ms. Huang to his contacts at Ford, calling her, among other things, the worst student that he had ever had, and directed his Ford contact to ignore Ms. Huang when Lori Herman from

Ford asked Ms. Huang to apply for a job, and did so with the wrongful intent to interfere with Ms. Huang's prospective contractual relations and prospective employment at Ford Motor Company in Michigan

239.   This resulted in Ford Ms. Huang withdrawing its interest in Ms. Huang.

240.   Rizzoni intentionally sabotaged Ms. Huang's job prospects to keep her at the OSU where he could sexually harass her and abuse her in retaliation for her resisting his sexual advances.

241.   Rizzoni had no privilege or justification for these actions.

242.   Rizzoni's conduct was willful, wanton, malicious and oppressive, and was undertaken with the intent to harm Ms. Huang, and justifies the award of exemplary and punitive damages.

### N.   Defamation (against Rizzoni only)

243.   Ms. Huang restates and realleges all prior paragraphs of the Complaint as if set out here in full.

244.   Rizzoni made a series of intentionally false, misleading, and disparaging statements about Ms. Huang, including but not limited to:

    a. Statements to Ford Motor Company officials, who were supervising Ms. Huang's internship and research, and had

indicated to Ms. Huang that they would offer her a job after she finished her Ph.D.;

b. Statements about Ms. Huang to members of her Ph.D. candidacy committee, resulting in her failing the exam;

c. Rizzoni's rebuttal to Ms. Huang's complaint, which included numerous defamatory statements about Ms. Huang; and

d. Upon information and belief, Rizzoni made oral defamatory statements to OSU's investigators following Ms. Huang's reporting his pattern of sexual harassment, sexual assault, and retaliation.

245.   Rizzoni published these statements to individuals at Ford Motor Company and other individuals within the OSU community, including the MAE Department faculty and staff.

246.   Rizzoni's publication was without privilege or justification.

247.   Rizzoni's defamatory statements caused Ms. Huang damages, including emotional distress and lost economic opportunity.

248.   The aforementioned acts were willful, wanton, malicious and oppressive, were undertaken with the intent to harm Ms. Huang, and justify the award of exemplary and punitive damages.

## VI.   PRAYER FOR RELIEF

Wherefore, Ms. Huang demands judgment in her favor and against

OSU and Rizzoni, and:

   a.  Declaratory and injunctive relief to protect Ms. Huang and
       other future students from sexual harassment and assault by
       Rizzoni and others at OSU and to place Ms. Huang in the
       position she would have been in absent OSU and Rizzoni's
       wrongful conduct;

   b.  Money damages for lost economic opportunity;

   c.  Money damages for emotional distress;

   d.  Money damages for medical expenses caused by emotional
       distress;

   e.  Exemplary and punitive damages;

   f.  Reasonable attorney's fees and costs of suit; and

   g.  Any and all other relief that the Court deems just and proper.

## VII.   JURY TRIAL DEMAND

Ms. Huang demands a jury trial on all issues so triable.


Respectfully Submitted,



*/s/Bruce C. Fox, Esquire*
Bruce C. Fox, Esquire (Pa. ID 42576)
bruce.fox@obermayer.com
Andrew J. Horowitz, Esquire (Pa. ID 311949)
andrew.horowitz@obermayer.com
Qiwei Chen, Esquire (Pa. ID 322789)

qiwei.chen@obermayer.com
Obermayer Rebmann Maxwell & Hippel LLP
500 Grant Street, Ste. 5240
Pittsburgh, PA 15219
412-566-1500 (p)
412-281-1530 (f)

*Counsel for Plaintiff, Meng Huang*

*/s/John G. Adam, Esquire*
Stuart M. Israel, Esquire (P15359)
israel@legghioisrael.com
John G. Adam, Esquire (P37205)
jga@legghioisrael.com
Legghio & Israel, P.C.
306 S. Washington, Suite 600
Royal Oak, MI 48067
Phone: 248-398-5900
Fax 248-398-2662

*Local Counsel for Plaintiff, Meng Huang*

Dated: August 31, 2018